FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Feb 19 2022

KEVIN P. WEIMER, Clerk

By: s/B. Evans
Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

RYAN LAMONT GARNER
LASHANA TANIKA SIMMONS-JONES
DAMIAN JEREMIAH BROWN

**CRIMINAL COMPLAINT**

Case Number: 1:22-MJ-166

I, the undersigned complainant depose and say under penalty of perjury, the following is true and correct to the best of my knowledge and belief. Beginning on or about February 15, 2022, and continuing to on or about February 18, 2022, in Clayton County, in the Northern District of Georgia, defendant(s) did, conspire to and did knowingly deal in firearms without a license, provided false information to a federal firearms licensee.

in violation of Title 18, United States Code, Section(s) 371, 922(a)(1)(A), and 922(a)(6).

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.   Yes

JONAH JAMES
Digitally signed by JONAH JAMES
Date: 2022.02.19 15:10:44 -05'

Signature of Complainant
ATF S/A Jonah James

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

February 19, 2022                                    at    Atlanta, Georgia
Date                                                            City and State

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                  Signature of Judicial Officer
AUSA Stephanie Gabay-Smith /
stephanie.smith@usdoj.gov

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A COMPLAINT

I, Jonah E. James, depose and say under penalty of perjury:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed since May 2021. I am currently assigned to the Atlanta Group I, which is involved in investigating various facets of firearms trafficking. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. Prior to becoming an ATF SA, I was a SA for the Air Force Office of Special Investigations, during which time I conducted investigations involving drug use and distribution, aggravated assaults, sexual assaults, and child pornography, among other crimes. I also hold a bachelor's degree in Criminology from West Virginia University in Morgantown, West Virginia.

2. During my tenure as an ATF Special Agent, I have received specific training on FFL burglaries, firearms trafficking and interviewing. I have participated in large scale investigations resulting in the arrest and prosecution of offenders at the federal level. As part of those investigations, I have conducted or personally participated in both physical and electronic surveillance. I have also been involved in the execution of various types of search and arrest warrants. I have personally conducted and/or assisted in investigations of criminal acts involving violations of Title 18, United States Code, Sections 922(a)(1)(A) [Dealing in Firearms Without a License], 922(a)(6) [Providing False Statements to a Federally Licensed Firearms Dealer], and 371 [Conspiracy].

3. As an ATF SA, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7). Therefore, I am empowered to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4. The facts contained in this affidavit come from my personal observations, ATF records/documents, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and does not set forth all my knowledge about this matter.

5. Based on the facts below, there is probable cause that has committed violations of Title 18, United States Code, Sections 922(a)(1)(A) [Dealing in Firearms Without a License], 922(a)(6) [Providing False Statements to a Federally Licensed Firearms Dealer], and 371 [Conspiracy].

## PROBABLE CAUSE

6. On February 15, 2022, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (SA) Don Dorman received information from an employee of the Arrowhead Pawn Shop (APS), a Federal Firearms Licensee (FFL), located at 6433 Tara Blvd, Ste A, Jonesboro, Georgia, 30236, regarding what they suspected to be straw purchasing activity.

7. The APS employee told SA Dorman that Ryan Lamont GARNER had entered APS and said he wanted to buy multiple firearms. The employee told SA Dorman that GARNER arrived with an unidentified female and a male they recognized as having previously shopped at APS. The employee said that GARNER was shopping for Glock 9mm pistols but, he mentioned that he was, "Waiting for his money to come in," or words to that effect.

8. The employee also said they overheard a conversation that the unidentified female was having on her cellular telephone with an unknown individual. The APS employee believed the individual on the other end of the phone call may have been directing the unidentified female as to which firearms GARNER should purchase. The employee told SA Dorman that GARNER filled out an ATF Form 4473, and he indicated that he would arrive the following day to purchase four firearms. SA Dorman asked the employee to let him know if GARNER returned to purchase the firearms.

9. On February 16, 2022, ATF SA Jonah James reviewed ATF records and learned that GARNER had purchased nine firearms from two separate FFLs on February 14, 2022.

10. According to ATF records, GARNER purchased the following firearms from Forest Park Army Navy and the Fairburn Pawn Shop. Both FFLs were located in the Northern Judicial District of Georgia.

- Glock, model 43X, 9mm, pistol, serial number BVWP702
- Glock, model 43X, 9mm, pistol, serial number BWVU377 (Agents later learned that the correct serial number for this firearm was BWCU733)
- Glock, model 19, 9mm, pistol, serial number BVMK286
- Glock, model 26, 9mm, pistol, serial number BVVN172
- Glock, model 43, 9mm, pistol, serial number AFVW876
- Glock, model 43, 9mm, pistol, serial number AFWL554
- Glock, model 26 Gen 5, 9mm, pistol, serial number AGGA153
- Glock, model 26 Gen 5, 9mm, pistol, serial number AGGA159
- Glock, model 19 Gen 5, 9mm, pistol, serial number AGCV688

11. On February 16, 2022, agents conducted surveillance at APS and observed a dark colored Infinity Sport Utility Vehicle (SUV), bearing California license plate number 8ETP132 enter the APS parking lot. SA Dorman observed that the vehicle was occupied by an older African American female (driver) and a younger African American male (passenger). The two individuals exited the vehicle and proceeded towards APS. SA Dorman recognized the passenger to be GARNER from a Georgia driver's license photograph he reviewed earlier that day. Agents observed GARNER and the unidentified female (later identified as Lashana Tanika SIMMONS-JONES) enter APS. Shortly thereafter, SA Dorman was notified by an APS employee that GARNER planned to purchase six Glock firearms. The APS employee also said that they observed SIMMONS-JONES remove approximately three thousand dollars ($3,000.00) in US currency from her purse to pay for the transaction. SIMMONS-JONES also used her debit card to pay an additional balance of approximately one hundred and thirty-four dollars ($134.00). The APS employee told SA Dorman she would place the six firearms that GARNER purchased into a single cardboard box.

12. In addition, the APS employee told SA Dorman that during the firearms purchase, they were able to see that SIMMONS-JONES was having a conversation with a person that was listed as "Damian" in her cellular telephone. The conversation concerned firearms. The APS employee then observed a list of firearms with what appeared to be, the quantity listed next to the model designations of the firearm.

13. According to the APS employee, SIMMONS-JONES later read the firearms list, which "Damian" had sent to her via cellular telephone communication, to the APS employee and asked if they could give her a combined price for all the listed firearms. As the firearms transaction was ending, SIMMONS-JONES told the APS

employee that she was attempting to acquire a large quantity of firearms and thus far had already purchased about nine of those firearms. SIMMONS-JONES verbally relayed to the APS employee the following list of firearms she wished to acquire. SIMMONS-JONES requested that she be notified when APS employees determined an approximate price for the firearms. The following is the list the APS employee stated that SIMMONS-JONES read to them:

- 5- Glock. model 26. 9mm pistols
- 15- Glock, model 43X, 9mm pistols
- 15- Glock, model 19, 9mm pistols
- 10- Glock, model 23, .40 caliber pistols
- 2-Glock, model 21, .45 caliber pistols
- 3-Glock. model 30, .45 caliber pistols

14. At approximately 6:25pm, agents observed GARNER and SIMMONS-JONES exit APS. ATF SA Jonah James observed GARNER carry a brown cardboard box and place it in the trunk area of the SUV bearing California license plate number 8ETP132. A query of law enforcement databases revealed the vehicle was a rental vehicle owned and/or operated by the Hertz rental vehicle company.

15. Agents followed the SUV north on Tara Boulevard towards Interstate 75. After the SUV travelled onto Interstate 75 Northbound, Clayton County Police Department (CCPD) marked units initiated a traffic stop on the vehicle because it was operating with no lights on and was improperly changing lanes.

16. CCPD's roadside investigation revealed that SIMMONS-JONES's license was suspended, and they observed that there was an odor marijuana emanating from the

vehicle. CCPD officers located a Hertz rental car agreement in the vehicle which indicated the vehicle was rented by Damian BROWN.

17. Based upon their investigation, CCPD officers searched the vehicle and located approximately six ounces of suspected marijuana, six Glock firearms located in a cardboard box, and an additional Glock firearm which was located in GARNER's backpack. The six firearms found in the cardboard box matched the firearms that had just been purchased by GARNER at APS.

18. As CCPD was conducting their traffic stop investigation and search of the vehicle, GARNER agreed to speak with SA Dorman. SA Dorman explained to GARNER that he was not under arrest, but that he suspected that violations of Federal firearms laws had occurred. GARNER stated that he had purchased a "load" of firearms and estimated that a "load" meant 10 firearms. GARNER stated that the money he paid for the six firearms he had purchased from APS was provided by SIMMONS-JONES.

19. GARNER acknowledged that, cumulatively, he had purchased approximately fifteen firearms with SIMMONS-JONES, and he acknowledged that the firearms were never intended for him (GARNER). However, GARNER claimed that he did expect to keep one or two firearms. GARNER stated he didn't know where the rest of the firearms were supposed to go.

20. SA Dorman reviewed SIMMONS-JONES' National Crime Information Center (NCIC) Criminal History (CH) report. In 2007, SIMMONS-JONES was convicted of three felony offenses - Burglary, False Imprisonment and Robbery in the Superior Court of Dekalb County, Georgia.

21. SA Dorman then interviewed SIMMONS-JONES. SA Dorman read SIMMONS-JONES a statement of rights (Miranda) from an ATF form 3200.4, Advice of

Rights and Waiver Form.  After advising SIMMONS-JONES of her Miranda rights, she provided a verbal waiver of her rights and agreed to speak with agents.

22.     SIMMONS-JONES initially claimed that a person known to her was opening either pawn shop or firearms store, and she was assisting them with acquiring inventory.  SIMMONS-JONES claimed that she had invested some of her own money in the purchase of the firearms and had received some of the funds from other parties.  SIMMONS-JONES said that the firearms were to be retrieved by an unknown party and, at that time, she would be repaid for her investment.  SIMMONS-JONES claimed that she did not know who would pick the firearms up.

23.     SIMMONS-JONES claimed that she gave the nine firearms which she and GARNER bought on February 14, 2022, to her cousin, "Brown."  SIMMONS-JONES said those nine firearms were in her cousin's residence in Roswell, Georgia.  SIMMONS-JONES initially said that her cousin "Brown" did not have any involvement with the scheme, but she later admitted that she had an agreement with "Brown" to source a larger quantity of firearms.

24.     SIMMONS-JONES confirmed that the individual she was referring to as "Brown" was Damian Jeremiah BROWN.  SIMMONS-JONES said that BROWN was the cousin of her child's father.

25.     SIMMONS-JONES stated that the firearms she planned to purchase on February 17, 2022, were for a buyer in Canada.  BROWN told SIMMONS-JONES that the buyer for the firearms was in Canada.

26.     SIMMONS-JONES consented to a search of her cellular telephone.  SA Dorman observed a contact in SIMMONS-JONES' phone listed as "Damian" which had

the associated phone number of (585) 953-9401.  A query of a law enforcement database confirmed that phone number (585) 953-9401 was associated with Damian BROWN.

27. SA Dorman observed a WhatsApp chat between SIMMONS-JONES and a contact listed as "Damian."  SIMMONS-JONES said that contact was BROWN.  SA Dorman observed a message thread between SIMMONS-JONES and BROWN which discussed the purchase of quantities of Glock firearms, specific models of Glock firearms that should be purchased, and timeframes during which the firearms should be sourced.

28. Specifically, in WhatsApp messages, BROWN detailed that he wanted to obtain 1,000 firearms.  BROWN planned to obtain the firearms in increments of 50 to 200, increasing as trust between him and another party built.  BROWN told SIMMONS-JONES that "they are taking care of transport…"

29. On February 18, 2022, agents observed GARNER, SIMMONS-JONES, Damian BROWN and Darius BROWN arrive at the APS in the Infinity Sport Utility Vehicle (SUV), bearing California license plate number 8ETP132.  GARNER exited the SUV, entered APS and purchased six Glock firearms.  After the purchase of the firearms, GARNER placed the firearms in the SUV, which was being driven by Damian BROWN, and the group attempted to leave the location.

30. Agents then stopped the vehicle and detained the four occupants.  The vehicle was subsequently searched and the six firearms were recovered from inside of the SUV.  Neither GARNER, SIMMONS-JONES nor BROWN are licensed to deal in firearms in Georgia or elsewhere.

31. Agents learned that Damian BROWN had provided approximately three thousand five hundred dollars ($3,500.00) in US currency to GARNER who purchased

the six firearms. Damian BROWN told GARNER to purchase four Glock 19's and two Glock 43X's.

## CONCLUSION

32.     Based on the foregoing, I respectfully submit probable cause exists to believe that Ryan Lamont GARNER, Lashana Tanika SIMMONS-JONES, and Damian BROWN have committed violations of Title 18, United States Code, Sections 922(a)(1)(A) [Dealing in Firearms Without a License], 922(a)(6) [Providing False Statements to a Federally Licensed Firearms Dealer], and 371 [Conspiracy].